The next case today is A. Michael Davallou v. United States, Appeal No. 201523. Attorney Charnas, please introduce yourself for the record. May it please the Court, my name is Scott Charnas for the Plaintiff Appellant M. Michael Davallou. I wonder if I could have one minute for rebuttal, Your Honor. Yes, you may. Thank you. I'd like to start by talking about the first issue, which is whether or not a plausible policy could be behind the government's challenged conduct in this case, and therefore whether the discretionary function exception should apply. This Court has said in Shansky that in order to make that determination, the Court should look at the facts on a case-by-case basis, that there's no formulaic approach. So in regard to the facts alleged in this case, I think it's important to understand that we allege that the government knowingly created a risk of serious and permanent injury, that such risk would directly and immediately expose the plaintiff and others to serious harm, and that the government failed to warn and failed to take any reasonable steps to protect the plaintiff and other bystanders from that harm. I submit that I can find no case with that kind of a fact pattern, and the government certainly has submitted no kind of case with that kind of fact pattern, where a Court has held that there could be any plausible policy considerations behind the challenged government actions or inactions. I think it's useful, perhaps, to look at the Hardeman v. United States case, which is a District Court of Massachusetts case, but in that case, the Court looked at the case of Green v. United States, which is a Ninth Circuit case, to differentiate the facts in that case from the case at Barr in that case. And in the Green case, the government, through its Forest Service, had started a second fire in the course of fighting a forest fire, and that second fire caused damage to neighboring properties, and the District Court in Massachusetts, in commenting on that case, essentially said that that was a case where the government itself created the harm, and that that action directly created the injury to the neighboring properties, and that it was unsurprising that the Court in Green would find that there was no plausible policy considerations behind that. Mr. Charnas, to figure out what the government's decision-making and analysis would presumably be and whether it was policy-based, we sort of need to know what it is you're saying they failed to do or did do that they shouldn't have done. And the complaint simply says they should have warned the public, and I don't really know what and how you mean they should have warned the public. And then it says they should have established a safety zone and kept people outside of it. How are we to know? I mean, are you talking about just a single warning from the DAOS that would have kept your client from going closer, or are you talking about putting up signs, or? I think, I'm sorry, I didn't mean to interrupt you, Judge. I think that in terms of warning, there could be a variety of warnings. Some might include putting up signs or temporary signs. Perhaps a bullhorn, for example, a megaphone that was used prior to actually firing, warning people that the decibel level from the cannon was such that it essentially could cause permanent and serious injury and that you either should remove yourself from the area or use some sort of earplugs or something of that nature. But something to warn the public that what the government was about to do could cause permanent and serious harm. And I think that if we get a chance to try this case, I think most people do not understand the permanent damage that can be done from that kind of an event. So you should have warned about it, or they should have kept the people back a safe distance so that the decibel levels from the howitzers would not be likely to cause injury. Could you address the issue about the knowledge on the part of the government with respect to the risk that would arise from the firing? Yes, looking at the four corners of the complaint, we've alleged that the government knew or should have known that decibel levels at that level would be likely to cause serious and permanent injury. There's a reference to a report about decibels that are caused. Is that in your complaint? No, that was brought up to the court in the motion. I forget, are we on 12B6 or summary judgment? It's 12B6, Your Honor. So you're in a position that the allegation and the complaint we just take is true, that they did know about the decibel level? Yes, Your Honor. And you just say the report then is irrelevant? Essentially, yes. For purposes of this motion. Just to be clear, didn't the district court say that it wasn't going to consider the report because it was not timely proffered to it? And didn't you argue that in your briefs that the district court should have considered it? I think in retrospect, Judge, I think that it doesn't really matter for purposes of this motion whether the pamphlet is in or not. I think the the allegation of the complaint should be sufficient to establish that the government knew or should have known that the decibel levels were such as to cause immediate harm. All right. So you've withdrawn that argument. Yes, Judge. OK, if I could move on to the second argument, which is in regard to the whether or not a private actor in like circumstances would be liable under Massachusetts law. And the court in the Supreme Court in the Indian towing case said that even though a activity may appear to be uniquely governmental, the court should look at whether there are private analogs. And I submit that there are certainly private analogs in this case. For example, if someone fired a pistol too close to someone's ear and caused acoustic damage, then they would clearly be liability under Massachusetts law or perhaps slightly more akin to the situation here. If on the 4th of July, someone fired one of those replica cannons without warning too close to the ear of the other bystanders and caused damage under that scenario, there clearly would be liability under Massachusetts law. So what the court did, the district court did in this case is instead of looking at private actors, they they essentially looked at a state actor and the and decided that the state actor in such a circumstance would be immunized from liability. I think I submit respectfully that that is incorrect, that the Supreme Court in the United States versus Olson case clearly held that you can't do that. In Olson, it was a allegation of a negligent mind. Counsel, I'm not certain that's accurate. Also, whether one has to reach this issue is another matter. But I thought the district court's analysis was that there was a specific state statute which protected people. And it was not a distinction between private people and government action. But the fact that there was a specific Massachusetts general law provision protecting people in this quasi military or military situation. But that that statute, Your Honor, protects only state actors. It doesn't protect private persons doing the same activity or like like the actors here were government actors. I think that in the in the Olson case, you the court said that you have to look at what state actors would do in like circumstances, not what state actors would do in like circumstances. OK, OK, I had thought you said that state statute was not conclusive in any event because it did allow some damages. No, Your Honor, I'm sorry if I misspoke. Now, what I'm trying to communicate is that the Supreme Court and in fact, this court in the McCluskey versus Mueller case said that you have to look at the private actor. You can't put the private actor in the state actor's shoes and then determine whether there would be liability under state law in regard to the state actor. The Olson case. That's time. Thank you. We have it. And you have your minute of rebuttal coming up. Thank you. Attorney Charnas, if you could mute your device at this time, and Attorney Canwit, if you could unmute and introduce yourself on the record, sir. Thank you. May it please the court, Thomas Canwit, on behalf of the defendant, the United States of America. Your Honors, in this case, the discretionary function exception has to be interpreted so as to provide immunity to the United States. The discretionary function clearly applies in this situation. As Magistrate Judge Bohl found and the district court adopted, there are a number of policy considerations at issue here. And clearly, under this circuit's precedent and the Supreme Court precedent, those policy considerations are sufficient so as to meet the second prong of the two part test. Plaintiff has conceded the first prong, which is that the acts were, in fact, discretionary. And the second part is where the challenge comes in as to whether there is a policy concern. And in the briefing, in particular, plaintiff has argued that there could not possibly be a policy which justifies the intentional deafening of the public. And what plaintiff has done is start in reverse order, essentially, by identifying the harm, treating it as inevitable and entirely foreseeable, and then saying that there could be no possible policy justification which would support a decision to create that harm. There are several problems with this. The first is a structural problem. It flies in the face of the Federal Tort Claims Act and DFE jurisprudence. The second is that it's making a factual leap. Although the complaint makes a bold allegation that the United States, or through its actor, the Massachusetts Army National Guard, knew that the decibel level of the howitzers could cause harm, that is just a bald legal conclusion. Well, isn't it a factual allegation that we need to assume for 12b6 purposes is true? And if you think, in fact, they didn't know that standing right next to a howitzer when you filed could damage your ears, you could prove that at summary judgment. We certainly could prove that at summary judgment, Your Honor. Don't we just assume that that's true? It's alleged specifically that your client knew, seems reasonable, frankly, that they would have known, but we don't need to make that judgment. Well, Your Honor, the Iqbal and Olson cases that we've cited in our brief, as well as Rodriguez-Reyes, all indicate that the circuit court does not have to abandon logic, and you don't have to take... It's not abandoning logic to think that a howitzer could cause hearing damage. Mr. Kanwit, you had a two-prong argument. You've wandered into dangerous territory here and getting into Iqbal when it does seem perfectly clear that probably the guys who were shooting off the howitzer were wearing ear protection, because it's pretty clear to everybody. Why it wasn't clear to the plaintiff may be a different matter, but you were starting to make the legal point that it is actually the choices made by the government that has to be the focus of the discretionary policy choice function analysis, and you say our case law dictates that. Could you go back to that? Yes, Your Honor. As plaintiff himself has alleged, it was not MANG, the Massachusetts Army National Guard, but the ancient and honorable artillery company, AHAC, which organized, supervised, led, controlled the event. So there are a number of policy choices which MANG made or could have made, and of course the standard is that the decision-making was susceptible to policy analysis. Let's make this a little more concrete. Describe to me the policy analysis that the governmental actors could have undertaken that would lead them to conclude, it's not a good idea before we fire this to just announce to the crowd, you better step back at least 30 feet. What policy analysis would lead someone to say, well, here's a policy why we shouldn't warn people? I think the structure is somewhat weighed in favor of plaintiff the way you asked the question, because the decision-making is, should we rely on AHAC to make the warning? Should we instead make warnings ourselves when AHAC is using their own sound system to make all of the warnings? Should we deploy additional guards people to set up barricades? I'm just saying he's got a claim in his complaint that said you should have given him a warning. It's somewhat, and I'm interested in what policy the government felt was furthered by giving no warning at all. And your honor, I think that it's a question of the unit of behavior that's being considered. The policy considerations in discussing or deciding how to handle the whole event involve matters of comedy, matters of aesthetics for the ceremony. Can you just, why don't you just answer the direct question? Is there a policy, if we focus on the question of warning, not who among the various actors should give it, not how much of a warning, but what is the policy that supports the conclusion of giving no warning at all? The policy would be that the harm is not so obvious. And that. And now just, that's great. But now assume, as we were suggesting one might, that we'd have to take the complaint as true, that there was knowledge that the sound would cause severe impairment because it was so loud. What would be the policy if the actors knew that for issuing no warning at all, not what's the policy for who should give it, not what's the policy, what's the content of the warning, but what was the policy for giving no warning at all assuming it's known that the decibel level is going to be so loud it would cause severe damage? There are two responses that come to my mind, Judge Barron. The first is relying on AHAC is a permissible policy decision. And we're not talking about AHAC and MANG making a singular decision such that it's simply will a warning be given or not, but a question of who will give the warning. The second response is that it could have been a decision if we assume, for example, hypothetically that it was only MANG doing this and AHAC was not involved and MANG made a decision not to give a warning. MANG might have done so out of aesthetic concerns that the ceremony is going forward and part of the beauty, if you will, of a canon salute is its surprise. And I do think, although I've gotten pushback from the panel, which I respect, I do think that there is a question as to whether the harm was in fact foreseeable. Let me put a sharper point on this thing because you want to fight the harm, even though it's alleged in the complaint. Suppose what we're talking about is a demonstration for the public of a landmine with a kill zone of 50 feet. Describe to me the policy analysis whereby the state actors would set off that landmine without warning people to stand at least 50 feet back. I'm just trying to imagine sitting around a conference table and somebody says, you know, should we warn people to stand outside the kill zone? And what would be the response that would lead to not give that warning? Under that hypothetical, Your Honor, it's hard to imagine a policy just justification for not giving the warning. But just work through why, because one possible answer I thought you gave before was, well, the beauty of the event. If that doesn't sound so good, when is there very serious danger? Well, if you take seriously the harm to the hearing, it's the same problem. But Your Honor, again, we're working backwards from the harm. You were working backwards to the harm in answering the landmine example. No, I think, Your Honor, we have to start with a more fundamental principle, which is if you have the power or the discretion to make a decision under the jurisprudence, you have the power to make the decision wrong. So in hindsight, all of these failure to warn cases look like bad decisions. Right. Because it's often a tragic outcome. That's right. The question is, and that would be equally true, you might say in the kill zone example, that was a bad decision not to warn people to step back. But I think, as you were suggesting, that probably is not the right way to look at it, that actually there's just no policy, because it's so obvious that any policy answer would be bad, that we just say there's not a policy at all. And the question is, why isn't that same logic equally applicable here if we take as true the complaint's assertion that the decibel level is so high it would cause immediate harm to the hearing? Your Honor, I can't get past the notion that that's a conclusion of law more than it is a fact. This is an event that's been going on for 250 years. That's time. Mr. Kenwood, I had thought you were going to say, it's happened 250 years, the government's always trusted the ancient and honorable society to do this. The location on the Boston Common, I think it was up on a hillside, it was not in an area where people normally are, that all of those involved policy choices. I thought that that was a part of the argument you presented in your briefs. It is, Your Honor. It absolutely is part of our argument. Can I ask one last question on that? Because this is one part that I'm not fully understanding. The ancient and honorable guard, there's this point that's referenced where you say, well, they trusted them to make the choice. Who is the defendant? In other words, what is their role in this vis-a-vis the U.S. government as the defendant? I'm not quite following. Is the idea here that the defendant is different than the actor that's firing the howitzer? The policy choice was a policy choice to leave it to them, and that if you want to sue them, you have to sue them separately, or are they the defendant also? Your Honor, the ancient and honorable artillery company is largely a former militia, now a ceremonial group. They did not fire the howitzers. The howitzers were fired by the Massachusetts Army National Guard in support of AHAC. AHAC was also a defendant, and they are not presently before the court. They have settled out. Is the discretionary function here not whether to warn, but who should give the warning, and that the defendant that we have here is the government, and the government would have a policy reason for leaving the decision to a different defendant? Is that the idea? That's one of the ideas. There are many decisions that occurred here, all of which we say are subject to policy analysis, but who would make the warning is absolutely part of it. But I thought the allegation was in the complaint that the ancient, looking at paragraph five, the ancient and honorable artillery company was acting as employees of the United States of America, so we're looking at their conduct, which is imputed to the United States. I'm sorry, but I think you're confusing AHAC with Mang. There's no allegation in the complaint, to my knowledge, that AHAC was an employee of the United States. Clearly, the issue below was, initially, was Mang acting on behalf of the United States. That turned on a complex matter of whether it was a training exercise or not. It, in fact, was. So, for purposes of the motion to dismiss, the government conceded that Mang was acting on behalf of the United States. Well, let me just understand. Suppose we had a case in which there is only employees of the howitzer. In that instance, the only issue would be, I think, the issue that we were engaging with you with before, which is there's some policy for the United States not having given any warning, and you have your answer to that. I understand that. But are you now saying that this case isn't that case? Because, actually, this case is a case in which, even if the United States had no policy reason for not giving a warning, because there was another actor, the ancient honorable artillery guard, we had a policy of deciding to leave it to them to give the warning. So, whether they erred or not, that's the discretionary function. I didn't really pick that up from your brief, but is that your argument? Our argument is that it's not. I don't think the analysis is simply about are there policies to do this or to do that. The discretionary function analysis has to... No, no. You're not understanding my question. I think I am. Can I have one more try, Your Honor? Sure. Go ahead. Thank you. And then Judge Barrett can ask further questions if you haven't answered. It might be more efficient if I just tell you exactly what I'm asking again. Please do, Judge Barrett. I apologize. That's okay. I guess what I want you to focus on is the policy. There needs to be a policy rationale, a conceivable policy rationale, so it's a policy-laden issue. We were debating before whether if the only actors involved were employees of the United States government, there could be conceivably a policy for not having given a warning. And we had that exchange. I understand your position. But I now understand you to be saying even if there is no argument that is persuasive that the government could offer on that score, this case is different because there is also a non-governmental employee involved in the event. And the choice of having either the employees of the United States government or the non-governmental employee decide whether to give the warning arguably is itself a policy-laden question, and therefore the discretionary function issue kicks in. Is that an argument the government's making? It is, Your Honor. Okay. Well, now, is there an argument in the complaint that the government can't simply delegate that with no thought at all as to whether that decision will be responsibly made? And what would be the policy basis for allowing that to be delegated? Because then we just have an example. It's the mine example. The government puts on the event, sponsors the event, contracts with an agent to perform the event. The agent's going to put on a blast of a landmine. And the government simply says, well, we just left it to them. I mean, they want to give a warning, they could. And the government's off scot-free from that. That seems surprising to me. Well, of course, in the way you phrase it, it would seem surprising. But I think if you have multiple actors involved and they have a relationship and sharing of responsibility, it could be a legitimate decision-making process to say that the entity, in this case AHAC, which is running the show, making all the announcements, doing the parade, it's their event, will be the one to determine when, how, and what type of warning to make. It was, to be clear, it was the United States that fired the howitzer. Yes, Judge Kayada, it was. And also, I just want to add, you said when, how, and what type. And all of those seem like if. You also seem to think it's okay to delegate if a warning should be given at all. I think as a hypothetical matter, that could be a matter of discretion. And there could be policy-based judgment about whether a warning should be given at all based on aesthetics. And sort of the flow of the event. So that would be true in the landmine case as well? I don't think you can say if it's true in one case, it's true in every single case. Well, what's the difference if we accept the allegation that the United States knew that this could cause serious harm to someone's hearing? It's just serious harm to your ear versus death. Is that the distinction? I think there are more distinctions. You've got issues about whether harm could be caused regardless of where somebody is, how close they are to the howitzers. It's sort of like the 4th of July event that Plaintiff himself brought up in his argument. Why wouldn't that be a situation in which everyone is exposed to hearing loss and therefore suit would lie against the organizers of the event? I think you have to look under the discretionary function analysis on a case-by-case basis. Plaintiff has made that argument. That's the way the courts have gone. I don't think you can make a blanket statement that if in one case you must warn because there's no possible policy justification, that means you would have to warn in all cases. Any further questions? No, thank you. I thank the panel. Thank you. Thank you. Thank you, Mr. Kanwit. Please mute your device at this time. Attorney Charnas, could you reintroduce yourself back on the record before you begin? Good morning. Scott Charnas for the Plaintiff Appellant A. Michael D'Avolu. I would just like to say in regard to the point that Judge Lynch made that questions about where the cannon are located, whether or not the government should have participated, that's not the challenge conduct here. There may well have been policy justifications for that. The challenge conduct is the failure to warn and the failure to create a safe place, and that's what the court should be counsel. Factually, those issues may well be related. Respectfully, I say no, Judge. Wherever the cannon was located, unless it was located where there were no people, there should have been a warning. I don't... Sorry, go ahead. No, you've made your point. Secondly, I would say that I doubt whether there's a plausible or there would ever be a plausible policy consideration behind the government delegating to a third party safety considerations considering the use or operation of military artillery, such that there would be a policy consideration behind giving AHAC the responsibility in regard to warnings in a safe location. The last thing I'd like to say, which I think is very important, is I want to bring the court's Mueller. In that case, this court said that the government... I'm sorry, the plaintiff had tried to argue that the government should be put in the shoes of a state actor because under Massachusetts law, the state actor would be liable. But this court said that, no, you cannot do that. The court must look at a private person. Okay, Mr. Charnas, you're making your argument. We've heard it. Thank you. All right. Thank you. That's all I have. I thank the panel. Thank you. That concludes argument in this case. Attorney Charnas and Attorney Kanwit, you should disconnect from the hearing at this time.